## EXHIBIT A

| | |
|---|---|
| State of Illinois | ) |
| | ) ss |
| County of St. Clair | ) |

### UNSWORN DECLARATION UNDER PENALTY OF PERJURY
### IN SUPPORT OF COMPLAINT FOR FORFEITURE

I, Kyle R. Waddington, declare under penalty of perjury the following:

At all relevant times, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1.  On May 26, 2022, declarant, as part of the DEA Fairview Heights Operation Trojan Warrior Enforcement Program, conducted a traffic stop on a 2021 Silver Toyota Rav4 bearing a Nevada registration for following too closely to a tractor trailer, along with improper lane usage on Interstate 70 east bound at the 27-mile marker in Madison County, Illinois. The vehicle was observed to be two car lengths back from the tractor trailer and crossed over the far-right fog line with its rear right tire.

2.  Declarant approached the passenger side of the vehicle to make contact with the driver and observed an empty Bang energy drink on the front passenger side floorboard. Declarant also observed the driver had an open Bang energy drink between his legs. Declarant informed the driver the reason for the traffic stop and requested his driver's license. Declarant received identification from the driver, who identified himself as Michael Roy KENDALL by providing an Arizona driver's license.

3.  Declarant asked KENDALL if the vehicle he was operating was a rental vehicle, to which KENDALL advised it was. Declarant asked KENDALL if he could provide him with a copy of the rental agreement, and to come to declarant's patrol vehicle, in order for declarant to issue a warning for the traffic infractions. KENDALL agreed to do so and complied with declarant's request. As KENDALL

was stepping out of the vehicle, declarant observed a large duffel bag in the back trunk area of the vehicle.

4. Declarant queried KENDALL's information in law enforcement databases and observed that KENDALL had previous arrests for drug history DUI, Possession of Marijuana, Possession of Drug Paraphernalia, Theft, Domestic Violent Criminal Damage, Possession/Manufacturing/Delivery of Marijuana, and a Suspended driver's license. While declarant was speaking with KENDALL, he asked KENDALL where he was headed, and KENDALL stated, "Maryland." Declarant stated that was a long trip across the country, and KENDALL responded, "Whew, it's a long one." Declarant asked KENDALL how many hours that takes him, and KENDALL stated, "A lot."

5. Declarant asked KENDALL what takes him out to Maryland, and KENDALL stated, "work." KENDALL stated he installs "cable wire." KENDALL later stated he was a "computer technician." Declarant knew from his training and experience that for someone to drive non-stop from Peoria, Arizona to Maryland, it would take them approximately 34 hours. Declarant asked KENDALL if his company wanted him to drive out there, instead of fly, and KENDALL stated, "Yes." Declarant asked KENDALL if he ever flies out to Maryland and KENDALL stated, "Once in a while." Declarant asked KENDALL if he always goes out to Maryland for work, and KENDALL stated, "Wherever they send me."

6. Declarant observed on the rental agreement that the vehicle KENDALL was occupying was rented on May 24, 2022, at 10:47 p.m. from South Phoenix, AZ, and was due back on May 27, 2022, at 1:00 p.m. in Hanover, Maryland. Declarant found it odd that KENDALL rented the vehicle, rather than his employer. Declarant further found it odd that the vehicle was rented at 10:47 p.m. on May 24, 2022, knowing that KENDALL had a work trip planned in advance to Maryland. Declarant also observed on the rental agreement that the vehicle cost KENDALL $1,376.98 for "one-way" travel.

7. Declarant asked KENDALL how long he would be in Maryland, and KENDALL stated,

"Maybe a week." Declarant knew that was inconsistent with returning the rental vehicle back to Hanover, Maryland, and KENDALL would then not have had a vehicle while working in Maryland. Declarant asked KENDALL why his company did not rent the vehicle and KENDALL stated, "They reimburse me."

8. Declarant queried the vehicle registration through license plate readers (LPR). Declarant observed that KENDALL's vehicle was photographed by LPR's on May 25, 2022, in New Mexico and on Interstate 270 in Illinois on May 26, 2022. The LPR hit in Illinois was approximately twenty-two minutes prior to Declarant stopping KENDALL. Declarant knew from his training and experience, if KENDALL was coming from Peoria, Arizona, he should not be coming from Interstate 270 through Illinois.

9. During declarant's query of KENDALL, declarant asked KENDALL if he had been in some trouble in the past in the early 90's. Kendall stated, "The early "90's were fun for me," and smiled in declarant's direction. Declarant asked KENDALL what he had been in trouble for, and KENDALL stated, "Marihuana." KENDALL further stated he had a "dime bag" on him in the past and that was why he was arrested.

10. Declarant asked KENDALL if there was anything like that today in the vehicle. KENDALL stated, "No." Declarant asked KENDALL if there were any guns in the vehicle, and KENDALL stated, "No." Declarant asked if there were any large amounts of United States Currency in the vehicle, and KENDALL responded, "No." Declarant asked KENDALL if there was any heroin or cocaine, and KENDALL stated, "Aren't you supposed to say any mounds of drugs in the vehicle, and no there isn't."

11. Declarant asked KENDALL if he could have permission to search the vehicle and all of its contents. KENDALL became nervous and started bouncing his legs up and down while holding onto

his Bang energy drink tightly. Declarant could visibly see KENDALL grip the energy drink with both hands in a clutched manner. KENDALL looked towards declarant's direction and stated, "You pulled me over for what?" Declarant advised KENDALL it was for crossing over the right far fog line and following too closely to the tractor trailer.

12.     Declarant again asked KENDALL for permission to search his vehicle and all of its contents. Declarant asked if everything in the vehicle belonged to KENDALL.  KENDALL hesitated, said yes, and then became quiet and just looked straight ahead. Declarant asked KENDALL if he had any medical conditions, in which KENDALL stated, "No." Declarant advised KENDALL the reason he asked is because KENDALL began breathing very heavily (labored breathing). Declarant could visibly see KENDALL's chest rising up and down and could hear KENDALL breathe out in a noticeably loud manner. Declarant, from his training and experience, knew people tend to breathe heavily in stressful situations. KENDALL stated, "I have high blood pressure and I smoke a lot."

12.     Declarant asked again if he could search the vehicle and all of its contents. KENDALL stated, "No." As a result of KENDALL's criminal drug history; conflicting travel information from the LPR's; numerous caffeinated drinks; the rental vehicle being rented late at night; the rental vehicle being rented personally while on a "work" trip; a one way rental for three days, when it was supposed to be for a weeklong trip; nervous behavior to include legs bouncing up and down, and labored breathing; defeated stare; and driving from a source state all the way across the country to the east coast, Declarant believed KENDALL and his vehicle could be currently involved in criminal activity.

13.     Declarant advised KENDALL he would be calling for a K-9. Prior to calling for a K-9, KENDALL stated, "You're going to search the car anyway aren't ya?" Declarant responded by saying, "I am going to call for a dog." KENDALL then asked declarant, "What does the dog do?" Declarant advised KENDALL, "That he was not a dog guy (K-9 Officer)." Declarant at this time, advised

KENDALL that he had enough reasonable suspicion to believe that KENDALL, and his vehicle, were possibly involved in criminal activity.

14. Declarant read KENDALL his Miranda Rights Warning. KENDALL stated he understood his rights. While waiting for the arrival of a K9, declarant continued a consensual conversation with KENDALL. Declarant advised KENDALL that a dog was in route and KENDALL took a large deep breath. KENDALL advised declarant, "I want to smoke a cigarette." Declarant advised KENDALL he was being detained and he was not getting out of the car to smoke a cigarette.

15. Declarant observed KENDALL to appear to be physically exhausted and had a very disheveled look. KENDALL's appearance looked untidy and he would intermittently fall asleep while holding his caffeine drink with a tight grip. Through Declarant's training and experience, it is common for drug traffickers, and money launders, who try to travel long distances in short time periods, to drink high caffeinated drinks.

16. Declarant observed KENDALL to have the look of defeat on his face, especially as he was abruptly falling to sleep in Declarant's front passenger seat. Declarant asked KENDALL if he was ok, and KENDALL responded by saying, "Yep." Declarant once again advised KENDALL that his chest was rising "a mile a minute over there." Declarant asked KENDALL why he didn't want him to search the vehicle, and asked KENDALL if it was due to the large bag in the back. KENDALL looked in declarant's direction and just stared at him. KENDALL's chest continued to rise in a quick fashion, while his legs were visibly shaking.

17. KENDALL stated, "You guys have other people out on the road looking for people like me, huh?" Declarant asked KENDALL what he meant by, "People like him?" KENDALL responded, "I remember when I got this drink." Declarant asked KENDALL where he was when he got that drink, and KENDALL stated, "Colorado." KENDALL once again took a deep breath a short time later after

advising he was coming from "Colorado." KENDALL stated once again he would like a cigarette. Declarant has seen this through his training and experience that someone who is highly stressed and or nervous constantly ask for a cigarette to relieve the stress they are in.

18. KENDALL also stated he had consumed two Bang energy drinks while driving. That is consistent with the open empty Bang energy drink Declarant observed on the front passenger side floorboard, along with the current one KENDALL was consuming.

19. A short time later, Pontoon Beach Police K-9 Sgt. James Autery (Sgt. Autery) arrived with his K-9 partner "Riot." Sgt. Autery conducted an open-air sniff of the SUV with his K-9 Riot. Sgt. Autery informed declarant and KENDALL of a positive alert for narcotics by K-9 Riot. Declarant informed KENDALL that the K-9 had alerted to the vehicle and asked KENDALL again if the contents of the vehicle belonged to him. KENDALL responded "yeah." TFO Brandon Smiley, TFO Larry Brantley, TFO Leo Kelly, and TFO Kevin Thebeau arrived on the scene.

20. Due to the positive K-9 alert, Declarant began searching the rear of the SUV. Declarant opened the large duffel bag he had originally observed and located miscellaneous clothing inside of it, along with a few small work tools in another bag. Declarant observed an open brown box that contained two large grocery style type bags. Declarant opened the bags and observed a large amount of rubber-banded United States Currency (USC). The USC consisted of bundles that had bank band increments of $2000.00, $5,000.00, and $10,000.00. Declarant also located two plastic bags inside of another reusable grocery type bag. One of the bags had the name "Vance LLC" written on it along with a written cash amount of "$24,000.00." The second bag also had the name "Vance LLC" written on it with a cash amount of "$36,000.00." Upon locating the large amount of USC, declarant placed KENDALL into handcuffs behind his back.

21. TFO Smiley located a clear plastic bag containing a white rock like substance, suspected

to be methamphetamine in KENDALL's left sock. The suspected methamphetamine was later transported to the DEA Fairview Heights Resident Office. TFO Smiley also located a glass pipe with suspected methamphetamine residue inside KENDALL's left front pocket. The glass pipe was put into a bag and was later transported to the DEA Fairview Heights Resident Office (FHRO).

22. Declarant photographed all the USC in its original position and placed all the USC into a self-sealing evidence bag. Declarant asked KENDALL if any of the USC belonged to him, and KENDALL stated, "Yes." KENDALL was asked to sign the evidence bag since he claimed ownership of the USC. After KENDALL signed the evidence bag, declarant signed and sealed the bag containing all of the USC in KENDALL's presence and later completed and issued a DEA-12 receipt to KENDALL.

23. In order to do a more thorough search and evidence collection, it was decided to transport the vehicle to a safe and secure location. All other items were left in their original position. Declarant secured KENDALL into the front seat of his vehicle for transport to the FHRO. When declarant was transporting KENDALL back to the FHRO, KENDALL stated "Can you please not charge me with the meth that you got off of me? I can't have that on my record."

24. Upon arrival at the FHRO, declarant escorted KENDALL into the booking area, where KENDALL was secured inside. Declarant processed KENDALL's vehicle to include the taking of photographs. While at the FHRO, Declarant observed receipts from O'Reilly Auto Parts in KENDALL's vehicle showing that he was in Aurora, Colorado, on May 25, 2022.

25. Glen Carbon K-9 Officer Josh Daniels (K-9 Officer Daniels), and his K-9 Partner "Griff," arrived at the FHRO to conduct an open-air sniff of the USC. K-9 Officer Daniels informed declarant that K-9 Griff alerted to the odor of narcotics on the USC.

26. During the processing of evidence at the FHRO, Special Agent Winfred Strickland (SA Strickland) and Special Agent Ryan Bandy (SA Bandy) performed an audio/video recorded interview of

KENDALL. SA Bandy and SA Strickland asked KENDALL for consent to search his Android cellular phone, and KENDALL signed a DEA Consent to Search Form.

27. During the interview KENDALL told agents that the seized currency belonged to him. KENDALL would not elaborate and stated that "if they find out" they will "hurt him." Agents asked KENDALL what he meant by that statement and KENDALL stated that the money was his from selling weed that he was stealing from the dispensary that he worked at. KENDALL stated that over the past four years he had been stealing marihuana, selling it, and keeping the money in his bed.

28. As agents kept asking KENDALL to explain why he was traveling with the seized currency, KENDALL changed his story and stated that he was taking the currency to Maryland, but he did not know what the money was for. KENDALL explained that he works for Hardip ZHIM at ZHIM's marihuana dispensaries. He further stated that ZHIM owns "a bunch" of dispensaries in Maryland, Florida, Michigan, Pennsylvania, and New Mexico. KENDALL stated that he was being paid $5,000 to deliver the seized currency to Maryland.

29. SA Bandy and SA Strickland asked KENDALL for consent to search KENDALL's residence, in Peoria, Arizona. SA Bandy received consent from KENDALL, and KENDALL signed a DEA Consent to Search Form. SA Bandy contacted Group Supervisor Erik Vazquez (DEA-Phoenix Division) regarding consent from KENDALL.

30. Agents searched KENDALL's residence and no contraband or drug proceeds (US Currency) were found inside of the residence.

31. KENDALL was later released. When Declarant and SA Bandy were releasing KENDALL, KENDALL asked if he could just have "A little of his money back?"

32. On May 27, 2022, the USC was transported to Loomis for an official count.

33. An official count of the seized United States currency was conducted. The amount totaled

$549,860.00.

34.     Based on the foregoing, declarant believes that the $549,860.00 in United States Currency is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. Section 801 *et seq*.

Pursuant to 28 U.S.C. Section 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of November, 2022.

_____
KYLE WADDINGTON
Task Force Officer
Drug Enforcement Administration