IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>v.<br><br>$549,860.00 IN UNITED STATES CURRENCY,<br><br>　　　Defendant. | Case No. 3:22-CV-02711-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Claimant Hardip Zhim sent Michael Kendall on a cross-country journey starting in Arizona to deliver $549,860.00 cash to his friend Hemel Patel in Maryland. (Doc. 48-2, pp. 30-31, 33). Zhim planned to use the money to start a convenience store or gas station with Hemel, who had successfully flipped a gas station before. (*Id.* at p. 31). To start this venture, he borrowed $360,000 from another friend, Pradip Patel, and $105,000 from his father, Jarnail Singh. (*Id.* at pp. 16-20, 24-29, 32). The remaining funds came from Zhim's own savings. (*Id.* at p. 32).

Zhim entrusted Kendall to transport this large amount of cash because they worked together at an investment company—Zhim as an IT manager remotely handling "big picture items" and Kendall as an employee helping with the "day-to-day" operations. (Docs. 48-1, p. 1; 50-1, p. 6). When Zhim wanted to deliver the cash, he had to attend his father's immigration hearing in California. (Doc. 50-1, pp. 5-6). Conveniently, Kendall was already scheduled to drive to a Maryland satellite office for work, so Zhim figured Kendall could transport his cash and drop it off with Hemel. (Doc. 50-1, pp. 6-8).

Kendall personally rented a silver 2021 Toyota Rav4 in Arizona to start the journey to Maryland. (Docs. 1-1, p. 1; 48-3, p. 6; 50-1, pp. 7, 16).¹ The day Kendall embarked on the long drive, he stopped at Zhim's apartment. (Doc. 50-1, p. 8). Zhim handed Kendall a box containing grocery bags filled with cash and said, "please take [this] to Maryland." (*Id.* at pp. 7-8).

But the money never made it to Maryland. Days into the drive, on May 26, 2022, Kendall was pulled over by Drug Enforcement Administration Task Force Officer Kyle Waddington while driving eastbound on Interstate 70 in Madison County, Illinois. (Doc. 1-1, p. 1). Waddington claims that the vehicle veered over the fog line with its rear right tire and followed behind a tractor trailer too closely at two or three car lengths away. (Docs. 1-1, p. 1; 48-3, pp. 2-3). He communicated these two reasons to Kendall and informed Kendall that he would simply receive a warning—not a ticket. (Docs. 1-1, p. 1; 48-3, p. 3). Waddington asked for Kendall's driver's license and the rental agreement and inquired about the two energy drinks in the car. (*Id.*). Next, Waddington requested that Kendall step out of the car and migrate to his patrol vehicle to receive the warning for the traffic violations. (Docs. 1-1, pp. 1-2; 48-3, p. 3). As the pair walked towards the patrol car, Waddington spotted a large duffel bag in the back trunk area. (Doc. 1-1, p. 2).

While supposedly effecting the warning, Waddington asked about Kendall's destination and purpose for travel. (Doc. 48-3, p. 4). Kendall explained that he was traveling to Maryland for work. (*Id.*). Waddington expressed surprise that Kendall's company asked him to make such a long drive, as opposed to flying, and that Kendall personally rented a vehicle rather than his company renting it for him. (*Id.* at pp. 5-6). They continued with a mixture of small talk and further questions about Kendall's trip as Waddington ran Kendall's information through a law enforcement database. (*Id.* at pp. 4-7; Docs. 1-1, p. 2; 48-2, p. 11). Waddington flagged some

---

¹ Zhim was not involved in renting the car and was not listed on the rental agreement. (Doc. 50-1, pp. 7, 16).

previous arrests for drug history stemming back to the 1990s. (Docs. 1-1, p. 2; 48-2, p. 11; 48-3, p. 7).

Despite this dated criminal history, Waddington questioned Kendall about whether there were any drugs, guns, or large sums of U.S. currency in his rental vehicle. (Doc. 48-3, pp. 7-8). Kendall denied the presence of any such items. (*Id.*). Confused, he asked Waddington to explain the reason for the traffic stop again. (*Id.* at p. 8). Waddington briefly recounted the traffic violations, then sought permission to search the vehicle and all its contents. (*Id.*). Kendall explicitly refused. (*Id.*). But Waddington persisted.

Waddington repeatedly assured Kendall that he had no interest in small amounts of drugs for personal use, as long as Kendall was honest. (*Id.* at pp. 8-10). Again, Kendall urged that he did not understand. (*Id.* at p. 9). Then, Waddington launched into an explanation as to his "reasonable suspicion for [Kendall's] travel"—his work travel required a long drive across the country instead of a flight, and his rental car was due the following day in Maryland. (*Id.*). Waddington also reiterated Kendall's old drug conviction. (*Id.*). Kendall maintained his denial regarding drugs in the car. (*Id.*). Next, Waddington asked whether everything in the vehicle belonged to Kendall, to which Kendall replied, "Yep." (*Id.*). Waddington pounced again seeking consent to search the vehicle and its contents for the second time. (*Id.* at pp. 9-10).

The back and forth between the two continued. At one point, Waddington commented on Kendall's physical demeanor and asked about his medical conditions. (*Id.* at p. 10). According to Waddington, Kendall became nervous, started bouncing his legs up and down, and clutched his energy drink tightly with both hands. (Doc. 1-1, pp. 3-4). Waddington also observed labored breathing and a defeated stare. (*Id.* at p. 4). As to the heavy breathing, Kendall stated he suffers from high blood pressure and frequently smokes. (Doc. 48-3, p. 10). Waddington pressed again regarding drug-related contraband in the car. (*Id.*). And, for a third time, Waddington asked

Kendall for permission to search. (*Id.*). Kendall declined. (*Id.*). In response, Waddington told Kendall that he was being detained on generalized suspicion of being involved in criminal activity, issued *Miranda* warnings, and called a K9 unit. (*Id.* at pp. 10-13). Waddington thought Kendall said something and asked if Kendall was consenting to a search, to which Kendall answered, "No." (*Id.* at p. 11).

Unsuccessful yet undeterred, Waddington tried a few other tactics to gain Kendall's consent. While waiting for the K9 unit, Waddington told Kendall that he could "speed the process up" if he simply gave permission to search the car. (*Id.* at pp. 12-13). Then, Waddington attempted to capitalize on Kendall's request for a cigarette. (*Id.* at p. 13). He told Kendall he could not smoke while detained, but proposed that, if Kendall consented to a search, Waddington could grab a cigarette from the car. (*Id.* at pp. 13-14). Waddington probed into Kendall's rationale for refusing a search. (*Id.* at p. 14). In particular, Waddington mentioned the big bag in the back. (*Id.*).

Small talk ensued until the K9 unit arrived. (*Id.* at pp. 14-20). Once on the scene, the canine alerted to the passenger-side door, the driver-side door, and the back compartment. (*Id.* at p. 21). Receiving confirmation of the positive alert, Waddington again asked Kendall if everything in the vehicle belonged to him. (*Id.* at p. 22). Kendall replied, "Yeah." (*Id.*). Other task force officers arrived on the scene. (Doc. 1-1, p. 6). Waddington opened the rear hatch, unzipped the large duffel bag, and discovered several items. (*Id.*; Doc. 48-3, pp. 22-27). Inside the duffel bag, Waddington found miscellaneous clothing, a few small work tools, an open brown box with two large grocery bags, and additional grocery bags with plastic bags inside. (Doc. 1-1, p. 6). He opened the grocery bags in the box and discovered cash in bank band increments of $2,000, $5,000, and $10,000. (*Id.*). Then, he opened the other grocery bags finding plastic bags with "Vance LLC" and cash amounts written on them—one for $24,000 and one for $36,000. (*Id.*).

Upon finding the cash, Waddington handcuffed Kendall. (*Id.*; Doc. 48-3, p. 22). He also

asked Kendall if the cash was his, and Kendall stated that it was. (Docs. 1-1, p. 7; 48-3, p. 28). Waddington and the other officers collected, examined, and counted the cash before placing it into evidence bags. (Doc. 48-3, pp. 22-27). Another officer searched Kendall's person and found a clear plastic bag with a white substance suspected to be methamphetamine in his left sock and a glass pipe with suspected methamphetamine residue in his left front pocket. (Doc. 1-1, pp. 6-7). They placed the drug paraphernalia and cash on the hood of the squad car. (Doc. 48-3, pp. 23-26). Kendall signed the plastic evidence bags with the cash on the owner/possessor line. (Docs. 1-1, p. 7; 48-3, p. 29). Waddington transported Kendall back to the station and one of the other officers drove the rental car. (Docs. 1-1, p. 7; 48-3, p. 31). Once they arrived at the police station, a different K9 unit conducted an open-air sniff of the cardboard box from the car and the canine alerted for the presence of narcotics. (Docs. 1-1, p. 7; 48-1, pp. 17-18). Once the canine alerted, Waddington opened the box to find more cash. (Doc. 48-1, p. 18).

In November 2022, the Government initiated this civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6) alleging the $549,860.00 was furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or was money used to facilitate a violation of 21 U.S.C. § 801, *et seq.* (Doc. 1). Zhim filed a verified claim asserting he has a legitimate possessory interest in the seized currency. (Doc. 8). He now moves to suppress evidence of the funds seized based on the unlawful stop and search of the rental vehicle driven by Kendall. (Doc. 48). The Government responded to Zhim's motion arguing that he lacks standing to challenge the stop and search under the Fourth Amendment. (Doc. 50). Zhim also filed a reply brief and a supplement to his Motion to Suppress. (Docs. 54; 62).

## LEGAL STANDARD

Under 21 U.S.C. § 881(a)(6), all money furnished or intended to be furnished by a person in exchange for a controlled substance, and all proceeds traceable to such an exchange, are subject

to forfeiture to the United States. Civil forfeiture is a proceeding *in rem*, where the property itself is treated as being guilty of the wrongdoing. *United States v. Funds in the Amount of One Hundred Thousand & One Hundred Twenty Dollars ($100,120.00)*, 901 F.3d 758, 768 (7th Cir. 2018). The property owner's culpability is not considered in determining whether the property should be forfeited. *Id.* Thus, even when there is no criminal prosecution, the Government can seize cash that it believes is traceable to drug trafficking. *See* 21 U.S.C. § 881(a)(6); 18 U.S.C. § 983(a)(3)(B). The government bears the burden of establishing, by a preponderance of the evidence, that the property is subject to forfeiture. *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 454 (7th Cir. 2005) (citing 18 U.S.C. § 983(c)(1)).

"A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Rule G(5)(a)(i). The claimant may then move to suppress the seized property under the Fourth Amendment's exclusionary rule. *United States v. $128,915.00*, No. 20-CV-00667, 2021 WL 2432064, at *2 (S.D. Ill. June 15, 2021) (citing Rule G(8)(a)).

While there has been some debate as to whether the exclusionary rule should apply in civil forfeiture proceedings, district courts presented with motions to suppress in civil forfeiture actions typically resolve the merits of the claimant's Fourth Amendment challenge. *See United States v. Marrocco*, 578 F.3d 627, 642–43 (7th Cir. 2009) (Easterbrook, J., dissenting) (expressing doubt that the exclusionary rule applies to civil asset forfeitures); *but see United States v. $9,171.00 United States Currency*, No. 16-cv-00483, 2020 WL 9037091, at *2 (S.D. Ind. Mar. 18, 2020); *United States v. $96,480.00 in United States Currency*, No. 15-CV-0573, 2017 WL 1021292, at *5 (S.D. Ill. Mar. 16, 2017). Because the Government has not argued that suppression is an inappropriate remedy in a civil forfeiture matter, and the Seventh Circuit has not found the exclusionary rule inapplicable in this type of proceeding, the Court will review the merits of Zhim's motion and

Fourth Amendment challenge to the stop and search.

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. In order to "compel respect for the constitutional guaranty," the Supreme Court of the United States created the exclusionary rule. *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)). When applicable, the exclusionary rule forbids the use of evidence obtained by police officers in violation of the Fourth Amendment. *Davis*, 564 U.S. at 231–32.

Typically, "a seizure of personal property is per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) (internal quotation marks omitted). Fourth Amendment protections extend to the search of an automobile, though the Supreme Court has acknowledged that a diminished expectation of privacy exists in automobiles, which often allows officers to sidestep obtaining a warrant before conducting a lawful search. *Byrd v. United States*, 584 U.S. 395, 403 (2018).

As relevant here, the Fourth Amendment protects "personal rights" that "may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). A person "aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134. A person "seeking to suppress evidence obtained from an allegedly unconstitutional search bears the burden of establishing that the search violated his own Fourth Amendment rights." *United States v. Dixon,* 137 F.4th 592, 601 (7th Cir. 2025). Thus, an individual only has standing to challenge a search if he has a "legitimate expectation of privacy" in the area searched. *Id.*; *see also United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) ("[A] defendant

must show a privacy interest not only in the seized good, but also in the area where the good was found."). A court determines whether an individual has a legitimate expectation of privacy by considering: "(1) whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy; and (2) whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Carlisle*, 614 F.3d 750, 756-57 (7th Cir. 2010).

## DISCUSSION

As a preliminary matter, Zhim petitioned the Court for an evidentiary hearing on the motion to suppress. (Doc. 57). But the material facts, as presented to the Court, are undisputed.[2] Thus, the Court may rule on Zhim's motion without a hearing. *See United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion.").

Turning to the motion to suppress, Zhim challenges the stop and search of Kendall's rental vehicle in many respects. He urges that the purported traffic violations did not provide reasonable suspicion for the initial traffic stop, Waddington unlawfully prolonged the stop after issuing a warning, the K9 unit was improperly called, the positive alerts were unreliable, the alerts failed to provide probable cause for the search, and officers mishandled the seized evidence leading to a subsequent unreliable K9 unit inspection. (Doc. 48-1). Zhim also states that he had a reasonable expectation of privacy as the "sole and rightful owner of the property." (*Id.*). He characterizes the seized evidence as fruit of the poisonous tree. (*Id.*).

---

[2] Zhim describes the disputes warranting a hearing as the circumstances surrounding the traffic stop, validity of the K9 sniffs, and the nexus between Zhim's property and drug trafficking. (Doc. 57). These alleged categories of disputed facts are not specific, and, as explained further in this Order, they were not material for the Court's analysis as to Zhim's standing to raise a Fourth Amendment challenge.

In response, the Government argues that Zhim lacks standing to assert the Fourth Amendment rights of Kendall, the driver. (Doc. 50). The Government emphasizes that Zhim lacked any expectation of privacy in the vehicle. (*Id.*). Furthermore, the Government highlights that Zhim's tender of the box with cash to Kendall does not indicate that Zhim maintained control over it or made efforts to maintain a privacy interest in it. (*Id.*).

The Court agrees with the Government that there is an obvious issue with the motion to suppress—Zhim must demonstrate *his* Fourth Amendment rights were violated by the stop and search of the vehicle. It is undisputed that Zhim was halfway across the country in California when Waddington stopped Kendall in Illinois. Zhim neither occupied the vehicle nor interacted with officers at the scene.[3] In addition, he did not own the vehicle driven by Kendall, had no involvement in renting the vehicle, established no right to exclude others from the vehicle, and was not listed on the rental agreement. *See United States v. Powell,* 929 F.2d 1190, 1195-96 (7th Cir. 1991) (holding that a vehicle *owner* not present at the time of the stop should not have standing to object to the stop); *United States v. Elmore,* 304 F.3d 557, 562 (6th Cir. 2002) (no expectation of privacy when vehicle *owner* was not present or nearby at the time of the search and provided no evidence of ability to exclude others from the car or efforts to take precautions to maintain privacy in the car). Simply put, Zhim does not demonstrate a legitimate expectation of privacy in the vehicle. Thus, his Fourth Amendment rights were not infringed, and he lacks standing to seek suppression of evidence due to the unlawfulness of the stop and search of Kendall's rental car.

The motion to suppress solely challenges the stop and search of the vehicle. In his reply

---

[3] Even passengers in cars stopped by police can lack a legitimate expectation of privacy unless they can show some possessory interest in the searched vehicle. *See United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015). Passengers may, however, challenge the legality of a traffic stop itself. *See id.* And if the stop is deemed unlawful, the passenger has standing to move to suppress evidence derived from the illegal stop. *Brendlin v. California*, 551 U.S. 249, 255–59 (2007). Where the stop is lawful, however, the passenger lacks standing to challenge such evidence. *See Wilbourn*, 799 F.3d at 908. In any event, Zhim cannot achieve standing in this manner because he was definitively *not* a passenger at the time of the traffic stop.

brief, Zhim asserts that he had both a possessory and ownership interest in the seized funds and a continued expectation of privacy interest in the funds themselves because he packaged the money, arranged for its transport, and had a clear intent to control its delivery and destination. (Doc. 54). He also stresses that he hired a trusted coworker as a courier, who kept the money in its original bags, bank bands, and other packaging and concealed the bag in a large black duffel bag in the most private compartment of the vehicle. (*Id.*). Zhim characterizes his efforts as taking every precaution to maintaining his property's privacy. (*Id.*). And, for the first time, Zhim argues that he has standing based on his relationship to the currency and the closed containers in the vehicle, not the vehicle itself, and criticizes the Government's focus on vehicle-based standing. (*Id.*). "Reply briefs are an improper vehicle for presenting new arguments, and should be confined to the issues raised in the opening motion or brief." *Zambrana v. United States*, 790 F. Supp. 838, 843 (N.D. Ind. 1992); *see also United States v. Hughes*, 970 F.2d 227, 235 n. 6 (7th Cir. 1992) (arguments initially raised in a reply brief are waived). Thus, the Court need not consider this argument.

But even in considering Zhim's claim to a privacy interest specifically in the duffel bag or cash, the Court disagrees with Zhim. Having an ownership claim to the cash, or a possessory interest, does not automatically establish a privacy interest under the Fourth Amendment. *See United States v. Salvucci*, 448 U.S. 83, 92 (1980) (The Supreme Court declined "to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched."). To show a privacy interest in the containers within the vehicle, Zhim must substantiate his subjective and objective expectations of privacy in the duffel bag or box containing the cash. *See Carlisle*, 614 F.3d at 756-57. He has not done so.

To assess whether a subjective expectation of privacy existed, courts pursue a fact-specific inquiry that looks into an individual's affirmative steps to conceal and keep private whatever item was the subject of the search. *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007); *see also*

*United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014). There is no indication or claim that the duffel bag belonged to Zhim or that he personally packed the box with cash in the duffel bag. Zhim testified that Kendall came to his apartment, he handed Kendall a box with grocery bags full of cash, and he asked Kendall to take it to Maryland. The record is devoid of any sign that Zhim packed the car or duffel himself, instructed Kendall to conceal the box with cash, dictated where the cash needed to be stowed, maintained exclusive access to the duffel or box, concealed the contents of the box from Kendall, or attempted to secure or seal either the duffel or the cash in any manner. Zhim mentions the tinted windows in the trunk area of the vehicle, but as he was not involved in renting the vehicle, there is no evidence he even knew of the tint at the time.

Zhim's assertion that he took every precaution to maintain his property's privacy is wholly unsupported. His deposition testimony references little, if any, effort to maintain privacy in the cash. Again, he handed over an unsealed, unsecured package full of cash to a coworker and asked him to take the money to Maryland. There is no evidence that conversations took place as to the concealment of the cash, any attempt to secure the cash or place it into a locked bag or compartment, or any other indicia of a subjective expectation of privacy interest discussed above. *See United States v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004) (defendant's "tendering of the suitcase to the others for delivery to another city in a different state does not even hint that he retained any control over it or had taken any precautions to maintain his supposed privacy interest in it"); *cf. United States v. Basinski*, 226 F.3d 829, 838 (7th Cir. 2000) (defendant demonstrated continued desire to retain a privacy interest in a briefcase entrusted to a lifelong friend when defendant locked the briefcase, declined to give his friend the combination, and instructed his friend to burn the case in a remote location); *United States v. Silva*, 470 F. Supp. 2d 1202, 1208-09 (D. Haw. 2006) (driver had legitimate expectation of privacy in bag within car when he possessed the bag for three months, locked the bag, and placed the bag in the trunk).

The record also suggests that the duffel belonged to Kendall as it contained clothes (the only clothes in the car for a multi-day drive) and some work tools. Kendall also told officers that everything in the vehicle was his. Any subjective expectation of privacy Zhim could assert as to the duffel bag would be objectively unreasonable given that Kendall's clothes and possessions were present, and these possessions shared space with the box of money inside the duffel bag. *See United States v. Hayward*, No. 19CR717, 2020 WL 6146484, at *6 (N.D. Ohio Oct. 19, 2020) ("To the extent Defendant asserts any subjective expectation of privacy in a duffel bag chocked full of methamphetamine and someone else's personal belongings, the Court finds that interest is not one society is prepared to recognize as objectively reasonable."); *United States v. Rodriguez-Ramos*, 704 F.2d 17, 21 (1st Cir. 1983) (no expectation of privacy in a bag that was determined to be appellant's traveling companion's bag with the companion's personal possessions deposited in the bag and no expectation of privacy in an unsealed envelope contained in that bag).

Same as with the vehicle search, Zhim lacks the requisite subjective and objective privacy expectation in the closed containers within the rental car to raise a challenge under the Fourth Amendment. Thus, the search of the duffel bag—and the vehicle as a whole—did not infringe upon Zhim's Fourth Amendment rights. Because he cannot validly assert a Fourth Amendment challenge, the Court need not analyze Zhim's arguments as to the lawfulness of the search. *See Carlisle*, 614 F.3d at 760 ("Because [defendant] cannot validly assert a Fourth Amendment challenge to the search of the [item], we do not reach the merits of whether the search was proper."). Accordingly, Zhim's motion to suppress (Doc. 48) is denied. Of course, Zhim can still pursue his claim and interest in the seized funds as this case proceeds.

The Court duly acknowledges Zhim's arguments related to the lawfulness of the stop and search of Kendall's rental car. Waddington's tactics in effecting traffic stops and vehicle searches are not unfamiliar to this Court. These tactics—targeting rental cars, trailing them until a minor

traffic violation occurs, badgering the driver for consent to search, and extending the conversation past a warning leading to a search of the vehicle based on sketchy suspicion at best—certainly trouble the Court. But as discussed above, Zhim's Fourth Amendment rights were not implicated in the stop or search, and Zhim cannot assert Kendall's Fourth Amendment rights on his behalf to suppress evidence in this forfeiture action.

## CONCLUSION

For the reasons set forth above, the Motion for Evidentiary Hearing (Doc. 57) and the Motion to Suppress Evidence filed by Claimant Hardip Zhim (Doc. 48) are **DENIED**. As the Court has found Zhim's Fourth Amendment rights were not implicated in the stop or search, his motion to compel (Doc. 43) and the Government's motion to strike or otherwise exclude the testimony of Claimant's Retained Expert Witness, Roy Taylor (Doc. 53) are **DENIED as moot**.

**IT IS SO ORDERED.**

**DATED:  July 10, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**